**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-13579

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

CRISTIAN PONCE,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:23-cr-00064-RBD-RMN-1

————————————————

Before ROSENBAUM, BRANCH, Circuit Judges, and BECERRA,[*] District Judge.

BRANCH, Circuit Judge:

———————————————

[*] Honorable Jacqueline Becerra, United States District Judge for the Southern District of Florida, sitting by designation.

Cristian Ponce pleaded guilty to four charges related to his drug dealing, including being a felon in possession of a firearm and conspiracy to distribute drugs.  At sentencing, in determining Ponce's base offense level, the district court applied a cross-reference in U.S.S.G. § 2D1.1(d)(1) (relating to his drug offense) to U.S.S.G. § 2A1.2 (relating to second-degree murder) because it determined that Ponce's offense circumstances would qualify as murder under federal law.  Why?  Because as part of the drug conspiracy, Ponce was involved in a drug-related shootout in a parking lot that left two men dead: the driver of the vehicle in which Ponce was a passenger (his co-conspirator) and a rival drug dealer outside the vehicle.

Ponce claims that his co-conspirator fatally shot the rival drug dealer in self-defense; therefore, § 2D1.1(d)(1) should not apply, resulting in a lower base offense level and corresponding guidelines range.  But the district court found that the shooting furthered Ponce's drug-dealing conspiracy and that Ponce negligently placed himself in a circumstance requiring criminal activity when he brought a firearm to deal drugs on a rival's turf, which meant Ponce could not claim self-defense.  Ponce challenges the application of § 2D1.1(d)(1) on appeal.  After careful review and with the benefit of oral argument, we conclude that the district court appropriately applied the murder cross-reference and affirm.

## I.    Background

### A.    Factual Background[1]

Ponce and Savier Hernandez ("S. Hernandez") were together in a car in a shopping plaza parking lot in Orlando, Florida, around 2:00 p.m. on November 2, 2022. S. Hernandez was driving with Ponce in the front passenger seat. Two other men, Kevin Marrero and Eminem Esquilin, approached the vehicle, with Esquilin on the passenger side where Ponce was sitting. Esquilin then backed away from the vehicle, pulled out a firearm, and shot through the passenger window. A shot hit S. Hernandez; he died from his injuries five days later. Marrero also shot into the vehicle at the same time. In a security camera recording of the altercation, a shot appeared to come from the vehicle and hit Esquilin, who took off running before collapsing in the parking lot and dying from his wound. It is unclear who shot first from the video. S. Hernandez's vehicle reversed at an "uncontrollable rate of speed" out of the lot before crashing and flipping a few hundred feet away. In a recorded 911 call, S. Hernandez can be heard pleading for help, with Ponce yelling about being in a shootout. Witnesses saw

---

[1] We relay the facts as described in the pre-sentence investigation report ("PSI") the probation office prepared before sentencing. Ponce's only challenges to the facts in the final PSI were his assertions that Esquilin shot first and that Marrero was not close enough to hear anything Ponce said. Otherwise, Ponce challenged only the application of the cross-reference in § 2D1.1(d)(1).

Ponce help S. Hernandez out of the car, then depart the area before police arrived.

Police executed a search warrant for the vehicle and discovered two firearms, including one on the floorboard in front of Ponce's seat that appeared to have jammed, as well as bags containing fentanyl and cocaine. DNA tests on the jammed firearm returned a near-certain match for Ponce and two other individuals, including a likely match for S. Hernandez. The other firearm had one round in the chamber and "may have belonged to S. Hernandez," according to investigators. Police later interviewed Marrero and determined that the shootout was over drug-selling "turf." Esquilin had told Marrero that he needed "help" with someone dealing drugs on his turf, so the two men waited in the parking lot for an hour until Ponce and S. Hernandez arrived. Marrero confirmed that Esquilin shot S. Hernandez and explained that he saw S. Hernandez, but not Ponce, with a gun. Marrero also said that he thought he heard Ponce say "this is mine" in Spanish during their brief interaction.

A Federal Bureau of Investigation ("FBI") agent interviewed a witness about the shooting a year later. The witness provided a description of the following events from the parking lot on November 2, 2022:

> [A] dark in color Nissan SUV approach[ed] him. The passenger asked him if he wanted a sample. The witness stated that he asked for "coke" (cocaine). The witness was given a small bag when an individual [Esquilin] came up from behind and pulled him away

from the passenger side of the vehicle.  The witness heard the individual make a statement to the effect of, "What are you doing here?"  The witness stated that he began to move away toward a wooded area near the incident.  As the witness was moving away, he observed a second individual [Marrero] standing a distance away from the front of the SUV with his face covered with a firearm.  The witness stated that he heard gunshots from the vehicle and the individual standing on the passenger side.  According to the witness, the SUV then left the area, and the shooter from the passenger side had fallen down like he had been shot.

The witness admitted he was "high" that day and did not recall everything.  The witness identified Esquilin as the man shot outside the vehicle and explained that Esquilin normally provided drugs in the area.  The witness also told the FBI that the incident was a dispute over drug-selling "turf," with the individuals in the car trying to move in on Esquilin's area.

About a week after the shooting, police executed another search warrant that "authorized the search for evidence related to the homicide and illicit narcotics trafficking."  At Ponce's residence, police found Ponce in a car with a firearm that yielded matches to Ponce's DNA, as well as 50 small bags containing cocaine.  In the residence, police found a pill press with powdery white residue, a shoebox with $12,840 in cash, and an AK-47 that yielded a DNA match to Ponce.  The police also found two phones belonging to Ponce that contained text messages about drug sales and online

searches related to the parking lot shooting.   S. Hernandez's brother, Rodney Hernandez ("R. Hernandez") was also in the vehicle with Ponce.  Both men were arrested.

Analysis of the phones revealed texts between Ponce and R. Hernandez from after the shooting and others about drug dealing. In one text the day after the shooting, R. Hernandez told Ponce, "That not y'all side tho," to which Ponce responded, "I know . . . ."

### B.      Procedural History

As relevant here, a grand jury returned a superseding indictment charging Ponce with four criminal counts related to drugs and guns (but not murder): conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count 1); possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count 2); possession of a firearm and ammunition in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3); and felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (Count 5).[2]  Ponce entered an open plea of guilty to all four counts.

The probation office prepared a PSI before sentencing.  The PSI grouped Counts One, Two, and Five together to calculate the offense level, with a separate guideline range of a consecutive term

---

[2] Counts 4 and 6 of the superseding indictment pertained to charges against R. Hernandez.

of 60 months' imprisonment for Count Three as 18 U.S.C. § 924(c) required. The PSI noted that the guideline for a violation of 21 U.S.C. § 846 (Count 1) is U.S.S.G. § 2D1.1. But the PSI observed that the cross-reference in § 2D1.1 provided for a higher offense level if the offense circumstances involved conduct that would constitute murder.[3] And because Ponce had been a passenger in the vehicle involved in the November 2 fatal shooting over drug "turf" with "distribution quantities of controlled substances," the PSI concluded that application of the murder cross-reference was appropriate, that the base offense level under the cross-reference was 38, and that Ponce's criminal history category was IV. Absent the cross-reference, Ponce's total offense level would have been 17 under U.S.S.G. § 2K2.1.

Ponce objected to the murder cross-reference's application, arguing that S. Hernandez was a legal firearm possessor who shot Esquilin in self-defense. Ponce then filed a sentencing memorandum reiterating that the cross-reference should not apply because he "was not the aggressor" and "was never seen holding, pointing, or firing a weapon at anyone" and because S. Hernandez shot Esquilin in self-defense as a lawfully licensed firearm carrier. For its part, the government filed a sentencing memorandum

---

[3] Section 2D1.1 requires that if the offense circumstances involved conduct that would constitute second-degree murder under 18 U.S.C. § 1111 had the killing occurred in the United States's territorial or maritime jurisdiction, then the court should apply U.S.S.G. § 2A1.2 as the base offense level if the resulting offense level under § 2A1.2 is greater than the one otherwise applicable under § 2D1.1. *See* U.S.S.G. § 2D1.1(d)(1).

arguing that the murder cross-reference in U.S.S.G. § 2D1.1(d)(1) applied even if Ponce was not the shooter, because he was involved in the criminal activity and the shooting occurred within that activity's scope and was a reasonably foreseeable act.

The district court held a sentencing hearing and gave both parties the opportunity to address the murder cross-reference's applicability. Ponce argued the shooting was not foreseeable because there was no evidence showing Ponce and S. Hernandez were dealing drugs on a rival's "turf." Ponce also argued that S. Hernandez had a concealed weapons permit, which Ponce argued supported his self-defense argument. The district court disagreed, commenting that "there's no such thing as a lawful gun holder in the presence of narcotics." Ponce contended that Esquilin had "lured" him and S. Hernandez to the parking lot as part of Esquilin's and Marrero's plan to harm them, to which statement the court noted the inherent risks of mixing "guns and drugs" together. Ponce continued to press the self-defense argument, though his counsel acknowledged that Ponce "put himself [in the parking lot] negligently and in a negligent manner."

The government countered Ponce's claims, observing that a witness had received drugs from Ponce and S. Hernandez in the parking lot, the car contained individually packaged bags of drugs, and Ponce's text messages indicated that he was involved in drug sale activity and knew they were in someone else's territory. It argued that for the murder cross-reference to apply, the government needed to show that the shooting was part of a jointly

24-13579                Opinion of the Court                        9

undertaken criminal activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with the criminal activity. And because Ponce and S. Hernandez conspired to distribute drugs, were involved in a shooting over drug "turf," and knew that drug selling was dangerous, the cross-reference was appropriate. The government also rejected the self-defense argument, contending that Ponce needed to prove he did not negligently place himself in a position to use deadly force, an impossibility since Ponce went armed to the parking lot to sell drugs.

The court found the murder cross-reference applied. It explained why:

> Primarily, because this is—frankly, it is a quintessential drug transaction gone bad. It is the reason for *Pinkerton*[4] liability. It is the reason for the cross-reference that when firearms and drugs come together, the firearms are utilized by the individuals who are members of the drug trafficking organization, as was the case here, to protect their product, to protect their turf, to protect themselves, and to dissuade or to deter competition from individuals who might—if you want to deprive them

---

[4] *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946) (explaining that defendants may be held liable for illegal acts of co-conspirators done in furtherance of the conspiracy that were reasonably foreseeable).

of either their money, their drugs, or their customers. And that's what happened here.

Whether Mr. Ponce participated in it, whether Mr. Ponce knew, could have known, should have known that these other folks were, if I accept your version of the facts, lying in wait for him and his accomplice or his co-conspirator, in my view, makes no difference with respect to the legal application of the cross-reference.

So I'm going to find that the Government has met its burden of showing by a preponderance of the evidence that this was a drug transaction and that that firearm was used in connection with the facilitation of the drug transaction; and that as a consequence, it was reasonably foreseeable that the fire[arm] would be discharged or used and someone would be hurt or injured or, in this case, killed.

So the 2D1.1 cross-reference with 2A1.2 is appropriate under the circumstances. And in my view, the Probation Office has properly scored Mr. Ponce.

The court then adopted the PSI in full. After hearing mitigating evidence from Ponce, the court sentenced Ponce to 240 months' imprisonment, with concurrent 180-month sentences for Counts 1, 2, and 5, and a consecutive 60-month sentence for Count 3, with five years' supervised release to follow. The court noted Ponce's objection to the cross-reference.

Ponce timely appealed.

## II.    Discussion

Ponce argues on appeal that the district court committed clear error in applying the murder cross-reference in U.S.S.G. § 2D1.1(d)(1) without considering Ponce's self-defense claim. He claims the evidence shows "Marrero and Esquilin orchestrated a premeditated plan to lure and attack Ponce and S. Hernandez in retaliation over a turf dispute" that forced Ponce and S. Hernandez to defend themselves. In his view, these events differ from a "run-of-the-mill drug transaction" because Marrero and Esquilin "ambushed" Ponce and S. Hernandez. Thus, he contends that his justification defense (self-defense) precludes the murder cross-reference application and that the district court failed to address whether self-defense applied. Ponce relies heavily on an out-of-circuit, non-binding case, *United States v. Santiago*, 96 F.4th 834 (5th Cir. 2024), for the proposition that a defendant "engaging in unlawful conduct . . . does not, by itself, constitute provocation" that would negate self-defense. He maintains that *Santiago* establishes that the district court clearly errs when, as here, it fails to consider a defendant's claim of self-defense before applying the murder cross-reference in § 2D1.1(d)(1).[5]

---

[5] We decline Ponce's invitation to apply *Santiago*, which involved a drug dealer's claim of self-defense after a shootout in a hotel room. 96 F.4th at 840–41. While the Fifth Circuit there considered a similar standard, it did so in applying self-defense caselaw from that circuit that is not binding on this Court. *Id*. at 850 (applying *United States v. Branch*, 91 F.3d 699, 718 (5th Cir.

For its part, the government argues the district court did not err when it applied the murder cross-reference because the cross-reference does not contemplate affirmative defenses like justification and, in any event, Ponce has failed to show that the shooting constituted self-defense.

We address the arguments in three parts. First, we determine the appropriate standard of review. Second, we explain why Ponce can be held accountable at sentencing for the shooting of Esquilin. And third, we address Ponce's claim that self-defense negates the murder cross-reference.

## A.  Standard of Review

We generally review the district court's sentencing guidelines interpretation and application *de novo*. *United States v. Dupree*, 57 F.4th 1269, 1272 (11th Cir. 2023) (*en banc*). As for the district court's factual findings, we review for clear error. *United States v. Bishop*, 940 F.3d 1242, 1250 (11th Cir. 2019). We will not overturn findings for clear error unless, after reviewing the record as a whole and making all credibility choices in favor of the factfinder, the factfinder made a clear mistake. *Dupree v. Warden*, 715 F.3d 1295, 1301 (11th Cir. 2013).[6] Accordingly, we review the

---

1996)); *see Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 (11th Cir. 2010) ("[W]e consider decisions from other circuits as persuasive authority.").

[6] The government argues that we should review the district court's decision only for plain error, because Ponce failed to preserve his self-defense argument before the district court. *See United States v. Puentes-Hurtado*, 794 F.3d 1278, 1285–86 (11th Cir. 2015). The government claims that Ponce did not argue below that Esquilin's killing was not a killing under circumstances that would

24-13579　　　　　　Opinion of the Court　　　　　　13

district court's legal conclusions *de novo* and its factual determinations for clear error. *See United States v. Dupree*, 57 F.4th at 1272; *Bishop*, 940 F.3d at 1250. Ponce concedes that the "determination that a defendant's conduct constituted second-degree murder is a factual determination reviewed for clear error."

### B.  Relevant Conduct

We now turn to the district court's finding that the murder cross-reference applied to Ponce's sentence. Ponce maintains that S. Hernandez was the one who shot Esquilin.[7] But under the

---

constitute murder. But Ponce did argue, repeatedly, that the killing was self-defense, and that because self-defense is an affirmative defense absolving the successful claimant of culpability, Esquilin's death did not constitute murder.

The government also contends that Ponce did not argue that an affirmative defense would preclude the murder cross-reference. But again, Ponce made the self-defense argument below in his sentencing memorandum and at the sentencing hearing. At most, the slight changes in Ponce's positions are shifting arguments. *See Gould v. Interface, Inc.*, 153 F.4th 1346, 1354 (11th Cir. 2025) ("[P]arties can most assuredly waive or forfeit positions and issues on appeal, but not individual arguments." (alterations adopted) (emphasis omitted) (quotations omitted)). But Ponce plainly and repeatedly raised the core issue—whether the cross-reference for second-degree murder applied—in his objections to the PSI, his sentencing memorandum, and at his sentencing hearing. And he raised the same issue on appeal. Thus, Ponce preserved the issue of whether the district court should have applied the cross-reference.

[7] The government argues that Ponce may have been the shooter. We need not resolve this factual dispute. As we will explain, whether S. Hernandez or Ponce fired the shot does not change our analysis, because even if Ponce did not pull the trigger, the shooting could still be attributable to him as relevant conduct under § 1B1.3(a)(1)(B).

14                    Opinion of the Court                    24-13579

Guidelines' relevant-conduct provision, U.S.S.G. § 1B1.3(a)(1)(B), Ponce is liable for S. Hernandez's reasonably foreseeable actions in furtherance of the conspiracy. Ponce largely concedes this point and instead claims that S. Hernandez acted in self-defense, meaning that Esquilin's death was not second-degree murder and that the justification meant the shooting was not a criminal act. However, before we address that argument, we explain relevant conduct and the role it plays here in holding Ponce accountable for S. Hernandez's actions.

We begin by tracing the steps taken by the district court in applying a guidelines enhancement for second-degree murder even though the indictment did not charge Ponce with the offense. One of the charges to which Ponce pleaded guilty was for violating 21 U.S.C. § 846, which criminalizes both attempt and conspiracy to commit certain drug offenses. *See* 21 U.S.C. § 846. At sentencing, such a violation is subject to U.S.S.G. § 2D1.1. *See* U.S.S.G. app. A at 536.

Section 2D1.1(d)(1) contains a cross-reference that applies "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111[8] had such killing taken place within

---

[8] Murder under 18 U.S.C. § 1111 "is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). Malice aforethought refers to an "intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard to the consequences of human life, but malice aforethought does not necessarily imply any ill will, spite or hatred towards the individual killed." *United States v. McRae*, 593 F.2d 700, 703–04 (5th Cir. 1979); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209

24-13579                Opinion of the Court                15

the territorial or maritime jurisdiction of the United States." U.S.S.G. § 2D1.1(d)(1). If the cross-reference applies, the court is to "apply [U.S.S.G.] § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under [U.S.S.G. § 2D1.1]." U.S.S.G. § 2D1.1(d)(1). In this case, applying § 2A1.2 results in a total offense level of 35, rather than the total offense level of 17 that would apply without the cross-reference.[9] So we must decide whether Ponce is responsible for a killing that occurred under circumstances that would constitute second-degree murder.

In evaluating Ponce's culpability, we consider Ponce's relevant conduct, because "once the proper guideline section has been determined[,] . . . the defendant's relevant conduct must be considered in evaluating whether any additional cross-references must be applied to calculate his base offense level." *United States v. Belfast*, 611 F.3d 783, 826 (11th Cir. 2010). The court can "examine the relevant conduct contained in the PSI . . . in calculating the applicable guidelines range," including relevant conduct *not* charged in the indictment.[10] *Id.* Importantly, relevant conduct

---

(11th Cir. 1981) (*en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit handed down before close of business on September 30, 1981).

[9] We note that neither Ponce nor the government contend that the shooting of Esquilin would qualify as first-degree murder; thus, we analyze whether the shooting qualifies as second-degree murder under § 2A1.2.

[10] Under the guidelines,

includes "uncharged . . . conduct that is proven at sentencing by a preponderance of the evidence." *United States v. Gyetvay*, 149 F.4th 1213, 1239 (11th Cir. 2025) (quotation omitted); *see also United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999) ("The [g]overnment bears the burden of establishing by a preponderance of the evidence the facts necessary to support a sentencing enhancement."). The court's consideration of relevant conduct also means that when a defendant participates in "jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," the guidelines instruct the court to include the activity in the base offense calculation if the acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

As mentioned previously, Ponce concedes that the court properly determined that the fatal shooting of Esquilin was part of

---

[r]elevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as "all reasonably foreseeable acts and omissions of others in furtherance of" jointly undertaken criminal activity, "that were part of the same course of conduct or common scheme or plan as the offense of conviction."

*United States v. Gyetvay*, 149 F.4th 1213, 1239 (11th Cir. 2025) (quoting U.S.S.G. § 1B1.3(a)(1)–(2)).

Ponce's relevant conduct and that the court could consider it when calculating Ponce's offense level. U.S.S.G. § 1B1.3(a)(1)(B); *see Belfast*, 611 F.3d at 826; *Gyetvay*, 149 F.4th at 1239. We agree with Ponce that the district court properly found that the shooting of Esquilin was within the scope and in furtherance of the drug-dealing conspiracy, and that the use of the firearm was reasonably foreseeable. *See* U.S.S.G. § 1B1.3(a)(1)(B).

We pause to emphasize the reasonable foreseeability finding as it will also inform our self-defense analysis. The district court found that even if Esquilin and Marrero ambushed the car and Ponce did not expect the altercation that followed, Ponce did not need to expect the ambush for the use of the weapons he and S. Hernandez brought to be reasonably foreseeable. After all, there is a reason Ponce and S. Hernandez brought weapons to deal drugs: they anticipated violence might be necessary to facilitate their lawbreaking. *See United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006) (explaining that "guns are a tool of the drug trade" and "[t]here is a frequent and overpowering connection between the use of firearms and narcotics traffic" (quotation omitted)).

Thus, Ponce is responsible for any reasonably foreseeable acts his co-conspirator S. Hernandez performed within the scope and in furtherance of the conspiracy, including, as relevant here, the shooting of Esquilin. *See* U.S.S.G. § 1B1.3(a)(1)(B).

### C. *Murder Cross-Reference and Self-Defense*

Satisfied that Ponce is liable for his co-conspirator's acts, we now consider whether Ponce or S. Hernandez shot Esquilin under

circumstances that would constitute second-degree murder such that the murder cross-reference applies. We also ask whether a justification defense applies such that the shooting of Esquilin was not under circumstances that would constitute second-degree murder but rather showed the shooter acted in self-defense, negating the murder cross-reference.

The district court found that Ponce could not claim self-defense under the facts of this case. Ponce argues that conclusion was error, asserting that even if he would normally be liable for Esquilin's death because it stemmed from the drug dealing conspiracy, the fact that the shooting was self-defense means that Esquilin's death does not qualify as murder.[11] He stands by this contention despite his counsel's concession at sentencing that "Ponce put himself [in the parking lot] negligently and in a negligent manner." The government responds that Ponce cannot claim self-defense under these circumstances. We have not previously examined whether a self-defense claim could defeat the cross-reference in U.S.S.G. § 2D1.1(d)(1) at sentencing. We need not reach this issue in this case. After examining whether the offense circumstances in this case permit Ponce to avoid the

---

[11] We reject Ponce's contention that the district court failed to address his self-defense argument. The court held a sentencing hearing that involved counsel for both sides arguing about whether self-defense applied. It then concluded that "whether Mr. Ponce knew, could have known, should have known that these other folks were . . . lying in wait for him . . . makes no difference with respect to the legal application of the cross reference. . . . I believe that the Probation Office has correctly scored under the guidelines."

sentence enhancement, we conclude that even if a justification like self-defense could defeat a sentence enhancement, self defense does not apply under these facts.

We have recognized justification defenses to otherwise unlawful conduct in other circumstances. For instance, an individual charged with a § 922(g)(1) violation for possession of a firearm by a convicted felon can escape criminal liability if he can show in possessing the weapon

> (1) that the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) that the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that the defendant had no reasonable legal alternative to violating the law; and (4) that there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

United States v. Deleveaux, 205 F.3d 1292, 1297 (11th Cir. 2000) (quotation omitted). Deleveaux also provided the basis for our Circuit's pattern jury instruction on justification, which largely reflects the same four elements. See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) S16 (2025).[12] Both Ponce and the

---

[12] The pattern instructions explain that

> [t]o excuse a criminal act, the Defendant must prove by a preponderance of the evidence:

government cite similar versions of the four-factor test contained in *Deleveaux* in their briefs.  As noted earlier, however, we need not decide whether a justification defense can defeat a sentence enhancement because Ponce has not established that either he or his co-conspirator acted in self-defense; thus even if Ponce could claim a justification like self-defense, that justification would not apply here.[13]

As an initial matter, our circuit precedent limits a defendant's ability to claim self-defense in situations where the individual claiming the justification defense contributed to the conflict.  *See Deleveaux*, 205 F.3d at 1297 (requiring that "the

---

First: That there was an unlawful and present, immediate, and impending threat of death or serious bodily harm to the Defendant or another;

Second: That the Defendant's own negligent or reckless conduct did not create a situation where the Defendant would be forced to engage in a crime;

Third: That the Defendant had no reasonable legal alternative to violating the law; and

Fourth: That avoiding the threatened harm caused the criminal action.

Eleventh Circuit Pattern Jury Instructions (Criminal Cases) S16 (2025).

[13] We also need not reach the government's argument that Ponce could not vicariously claim self-defense for S. Hernandez's actions.  Both S. Hernandez and Ponce brought firearms to deal drugs on a rival's turf, and thus neither could show that they did not negligently place themselves in a position requiring illegal conduct—killing a rival drug dealer.

defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct" to prevail in a self-defense claim).  We have held that evidence that a defendant "allowed himself to be involved in a heated argument" could make a justification defense unavailable.  *United States v. Moore*, 76 F.4th 1355, 1365 (11th Cir. 2023).  Likewise, we concluded that evidence that the defendant "had been drinking and doing drugs" could contribute to a finding that the defendant negligently placed himself in a situation to act criminally.  *Id.* Evidence that the defendant "caused the situation to escalate" may also suffice to defeat self-defense.  *Id.*

A defendant must meet each of the four factors from *Deleveaux* to succeed in his self-defense claim.  *See Deleveaux*, 205 F.3d at 1297.  The parties largely agree that this case hinges on the second self-defense justification factor: whether Ponce negligently or recklessly placed himself in a situation that would force him to engage in criminal conduct, which he must show through a preponderance of the evidence.  *Id.*  As mentioned, Ponce's counsel all but conceded at sentencing that Ponce could not meet the second factor because Ponce "put himself [in the parking lot] negligently and in a negligent manner."  Still, Ponce contends on appeal that he was not the aggressor and could therefore claim self-defense.  But Ponce cannot show that the district court clearly erred in finding that he negligently put himself in a situation that would force him to engage in criminal conduct.

Instead, the facts show Ponce and S. Hernandez chose to bring guns with them to deal drugs on a rival's turf.[14] Police found drugs in the car after the shooting. Text messages revealed the extent of Ponce's involvement in drug dealing and his awareness that where he had chosen to deal was contested "turf." It was not clear error for the district court to conclude that a preponderance of the evidence showed this decision to deal drugs there anyway, made in full awareness that Ponce and S. Hernandez may use the weapons to facilitate their illegal activities, was at least negligent, if not reckless.[15]

That negligence means that self-defense does not apply in this case. As we have held, actions calculated to escalate tensions, like drinking or engaging in heated arguments, generally undercut self-defense arguments. *See Moore*, 76 F.4th at 1365. Possessing a firearm while distributing drugs in an area where Ponce knew rival

---

[14] As the district court observed, "no one is licensed to carry a firearm in the presence of narcotics," particularly when they are involved in the illegal sale of such products.

[15] As noted previously, the district court's conclusion that the shooting of Esquilin was reasonably foreseeable for the purposes of relevant conduct also informs the analysis of whether Ponce was negligent (as he conceded). In criminal cases, "a person acts negligently if he is not but 'should be aware' of such a 'substantial and unjustifiable risk' . . . in 'gross deviation' from the norm." *Borden v. United States*, 593 U.S. 420, 427 (2021) (quoting Model Penal Code § 2.02(2)(d)). In concluding that the shooting of Esquilin was reasonably foreseeable, the district court necessarily also concluded that Ponce should be aware of the risk. And knowing that someone may be shot and killed as part of one's actions is a gross deviation from the norm.

dealers operated is also an escalation. *See id.* Thus, the district court did not clearly err in concluding that self-defense did not apply because Ponce's negligence meant he could not meet the second *Deleveaux* factor and, consequently, that a preponderance of the evidence showed Ponce's offense conduct satisfied the murder cross-reference in § 2D1.1(d)(1). *See Deleveaux*, 205 F.3d at 1297; *Gyetvay*, 149 F.4th at 1239.

### III.    Conclusion

The district court did not err in applying the murder cross-reference in U.S.S.G. § 2D1.1(d)(1) based on Ponce's involvement in Esquilin's death.

**AFFIRMED**.